

**FILED**

Nov 21 2023, 8:59 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Wm. Joseph Carlin, Jr.
Auburn, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of B.M., C.M., and S.M. (Minor Children), Children in Need of Services, <br><br> and <br><br> N.M. (Father), <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner* | November 21, 2023 <br><br> Court of Appeals Case No. 23A-JC-1285 <br><br> Appeal from the DeKalb Circuit Court <br><br> The Honorable Kurt B. Grimm, Judge <br><br> Trial Court Cause Nos. 17C01-2301-JC-1, -2, -3 |

**Opinion by Judge Crone**
Judges Riley and Mathias concur.

**Crone, Judge.**

## Case Summary

N.M. (Father) appeals the child in need of services (CHINS) adjudications for his children B.M., C.M., and S.M. (the Children). He claims that the CHINS adjudications are erroneous and must be reversed because the trial court abused its discretion by denying his counsel's motion to withdraw, which deprived Father of his right to self-representation. He also argues that the evidence was insufficient to establish that the Children needed care, treatment, or rehabilitation that they were not receiving and were unlikely to be provided without the court's coercive intervention. Finding these arguments meritless, we affirm.

## Facts and Procedural History

The evidence in support of the CHINS adjudications follows. Father and J.C. (Mother) have three children: B.M., born in 2007, C.M., born in 2010, and S.M., born in 2013. Father's paternity was established by court order, and it appears that initially Mother had primary physical custody of the Children. In 2015, due to Mother's incarceration, she and Father entered into an agreement that granted Father custody of the Children.[1] After Mother's release in 2017, Father retained custody.

In 2022, the Children were on spring break with Father in Florida. Throughout the break, they called and texted Mother expressing apprehension over Father's

---

[1] The record does not reveal the terms of the agreement.

conduct, such as Father leaving them alone in a hotel room and not returning for a long time. In one call, they told Mother that they were "scared that their dad was driving with them drunk and he was swerving[.]" Tr. Vol. 2 at 28. Father was arrested and charged with operating while intoxicated as a third violation within ten years.[2] The Florida Department of Child Services detained the Children and placed them in foster care until Mother was able to travel to Florida to retrieve them. Mother and the Children returned to Indiana and lived with the Children's maternal grandmother (Grandmother) for the next six months. Mother filed a request for an emergency change of custody, but before the court ruled on the request, she returned the Children to Father's care, at his insistence, after he was released from jail on bail and had returned to Indiana.

[4]     In October 2022, Auburn Police Department Officer Jeffrey Arnett responded to a report of a disturbance at Father's residence. When Officer Arnett arrived, he observed Father in handcuffs with a bloody nose. Father was charged with class A misdemeanor domestic battery of B.M.

[5]     In December 2022, Grandmother contacted Officer Arnett and requested that he accompany her to Father's residence to check on the Children. When Officer Arnett was speaking to Father at the door to his house, B.M. came to the door and told the officer that "everything was not okay." *Id.* at 11. Officer Arnett could tell from B.M.'s demeanor that B.M. did not want him to leave. Officer

---

[2] The CHINS petition alleged that Father had been convicted in the Florida case, but Father testified at the factfinding hearing that the case was still pending.

Arnett asked Father if he could speak with the Children, but Father refused. Based on what B.M. had said, Officer Arnett informed Father that he was not going to leave until he confirmed that the Children were safe. Father began yelling at the police so loud "that everyone in the neighborhood could hear." *Id*. at 12. The police directed Father to lower his voice multiple times, but he refused. Ultimately, Father was detained so that the police could enter the residence to check on the Children. Father was charged with resisting law enforcement and disorderly conduct.

[6] In January 2023, Father was arrested and charged with operating while intoxicated (OWI). On January 12, 2023, the Indiana Department of Child Services (DCS) filed a petition alleging that the Children were CHINS because Father had multiple OWI convictions and had been charged with additional crimes in which he was under the influence of alcohol and the Children were physically or emotionally impacted. The petition further alleged that Mother was unable to provide for the Children's needs.

[7] That same day, the trial court held an initial and detention hearing and ordered the Children to be removed from their parents' care. DCS placed the Children with Grandmother. Father asked the court to appoint an attorney based upon his indigency, and the court appointed Keven Likes. On February 15, 2023, Father sent the court a letter requesting appointment of a different attorney, asserting that Likes had not provided him with any documents or evidence from DCS and that he had no confidence that Likes had any interest in defending him.

[8]     On March 6, 2023, the trial court held a CHINS factfinding hearing. Prior to the hearing, Mother signed an agreement stipulating that the Children were CHINS because she did not have appropriate stable housing and was unable to care for the Children. At the beginning of the hearing, Likes informed the court that Father had told him that "he wasn't interested in signing an agreement and he was interested in representing himself" and moved to withdraw from the case. *Id*. at 5. The trial court responded, "[A]t this late date, I'm not inclined to withdraw the appointment of Mr. Likes as [Father's] attorney[,]" and instructed the parties to proceed. *Id*. DCS called Officer Arnett, Mother, Father, and the DCS family case manager to testify. The Children's guardian ad litem was also present. Mother testified that she was currently homeless and that she believed that Grandmother's home was an appropriate place for the Children. Father also testified that Grandmother was providing adequate care for all their needs and had no objection to their placement with her.

[9]     Likes cross-examined all the witnesses, including Father. During his cross-examination of Father, Likes offered into evidence Father's plea agreement to the 2022 domestic battery, disorderly conduct, and resisting law enforcement charges and the 2023 OWI charge. Father was still incarcerated and awaiting sentencing. Father testified that, based on the plea agreement, he was hoping to serve his two-and-a-half-year sentence on house arrest, which would allow him to provide care to the Children. Likes also specifically questioned Father about each of the incidents giving rise to the charges against him, so that Father could tell his side of the story. At the close of DCS's case, Likes acknowledged that

the court had afforded him "a lot of latitude" in cross-examining Father so that Father said "what he was interested in saying." *Id*. at 70.

[10] At the close of the hearing, the guardian ad litem opined that he believed that a CHINS adjudication was appropriate. He stated that Mother admitted that the Children were CHINS and Father was in jail and was going to be in jail for at least another month and a half and possibly longer, and therefore neither parent was able to take care of the Children. The guardian ad litem explained that without the coercive intervention of the court, DCS would not be able to provide services to the Children. The court agreed.

[11] On March 22, 2023, the trial court issued an order finding that the Children were CHINS and that removal from the home environment was in the Children's best interests because "of the allegations admitted and of an inability, refusal or neglect to provide shelter, care, and or supervision at the present time." Appellant's App. Vol. 2 at 29.

[12] On April 24, 2023, Likes filed a motion to withdraw appearance stating that Father wished to represent himself. On May 1, 2023, the trial court held a dispositional hearing. DCS filed the predispositional report that morning. The trial court took judicial notice of the sentencing order in the Indiana cases to which Father had pled guilty and noted that he had been sentenced to two and a half years in the Indiana Department of Correction. Father again requested to represent himself, and, after ensuring that Father understood the drawbacks of self-representation, the court granted Likes's motion to withdraw. Father

testified that had he been permitted to represent himself at the factfinding hearing, he would have called witnesses and introduced text messages and video evidence from the December 2022 police welfare check that gave rise to his disorderly conduct and resisting arrest charges.

On May 10, 2023, the trial court issued a dispositional order, ordering that the Children remain outside the home and that Father contact the family case manager every week. The court found, just as it had in its prior order, that removal from the home environment was in the Children's best interests because "of the allegations admitted, [and] of an inability, refusal or neglect to provide shelter, care, and/or supervision at the present time." Appealed Order at 3. This appeal ensued.

## Discussion and Decision

## Section 1 – The trial court did not abuse its discretion by denying counsel's motion to withdraw at the start of the factfinding hearing.

Father first challenges the trial court's denial of Likes's motion to withdraw appearance that he made at the beginning of the factfinding hearing. We review a trial court's ruling on an attorney's motion to withdraw for an abuse of discretion. *In re K.S.*, 917 N.E.2d 158, 162 (Ind. Ct. App. 2009). "An abuse of discretion exists only when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court." *Id.*

[15] Father argues that by denying Likes's motion to withdraw, the trial court denied Father the right to represent himself. He further asserts that the trial court "made no inquiry whatsoever as to [his] reasons or his ability to self-represent[,]" and "[c]onsequently, [he] was deprived of his constitutional and statutory right to present evidence." Appellant's Br. at 9. In essence, Father is arguing that the trial court had a duty to make inquiries regarding his reasons for requesting self-representation before ruling on the motion to withdraw.

[16] We note that Father did not inform the trial court of his desire to represent himself until the start of the factfinding hearing. His earlier letter to the trial court did not indicate any desire on Father's part to represent himself. On appeal, Father directs us to no CHINS case that requires a trial court to question a parent who has been appointed counsel regarding why that parent wishes to proceed pro se when the request for self-representation is made at the latest possible moment. In the context of a criminal defendant's right to self-representation, our supreme court has held that the assertion of that right "must be asserted within a reasonable time prior to the day on which the trial begins" and that "[m]orning of trial requests are thus per se untimely." *Russell v. State*, 270 Ind. 55, 62, 383 N.E.2d 309, 314 (1978). Further, "[a]ny self-representation request made the day of trial or later may be summarily denied, for self-representation after this point is completely a matter of the trial court's discretion." *Id.* at 64, 383 N.E.2d at 315.

[17] We recognize that there are differences between criminal cases and CHINS cases, which are civil in nature. *In re Eq.W.*, 124 N.E.3d 1201, 1209 (Ind. 2019).

However, with regard to asserting the right to self-representation, we are unpersuaded that a party in a CHINS case is entitled to greater protections than a defendant in a criminal case. Thus, we decline to conclude that where, as here, a request for self-representation is made on the morning of the hearing, the trial court has a duty to make inquiries before ruling on a motion to withdraw.

[18] In addition, we are unpersuaded that the trial court's denial of counsel's motion to withdraw was clearly against the logic and effect of the facts and circumstances before it. DeKalb County Local Rule 17-TR-3.1-2 provides that the court shall grant permission to withdraw *only* upon the filing of an appearance by new counsel, upon written motion that has been served on the client ten days prior to filing, or upon other good cause found by the court. In this case, the first two options are clearly inapplicable, leaving only good cause as a permissible basis for granting the motion to withdraw. As noted, the motion was made at the beginning of the factfinding hearing. Our supreme court has stated, "None of the interests involved here, the right of self-representation, the right to counsel, or the interest in preserving an orderly … process, are furthered by the allowance of a last minute request" to self-represent. *Russell*, 270 Ind. at 62, 383 N.E.2d at 314. Rather, "experience has shown that day of trial assertions of the self-representation right are likely to lead to a rushed procedure, increasing the chances that the case should be reversed because some vital interest of the defendant was not adequately

protected." *Id.*, 383 N.E.2d at 314.[3] Given the untimeliness of the motion to withdraw and the dangers and drawbacks of self-representation, we cannot say that the trial court's summary denial of counsel's last-minute motion was an abuse of discretion.[4]

## Section 2 – Sufficient evidence supports the CHINS adjudications.

[19] Father also argues that there is insufficient evidence to sustain the CHINS adjudications. As we review his argument, we are mindful that appellate courts generally "grant latitude and deference to trial courts in family law matters." *In re E.K.*, 83 N.E.3d 1256, 1260 (Ind. Ct. App. 2017), *trans. denied* (2018). "This deference recognizes a trial court's unique ability to see the witnesses, observe their demeanor, and scrutinize their testimony, as opposed to this court's only being able to review a cold transcript of the record." *Id*. In determining whether sufficient evidence supports a CHINS determination, an appellate court does "not reweigh evidence or judge witness credibility[.]" *Eq.W.*, 124 N.E.3d at 1208. Instead, "[w]e consider only the evidence that supports the trial court's

---

[3] Father relies on cases that involved the right to counsel rather than the right to self-representation. These rights are not treated similarly, and therefore we find Father's cases inapplicable. *See Russell*, 270 Ind. at 59-60, 383 N.E.2d at 312-13 (explaining that right to counsel and right to self-representation encompass different interests and accordingly do not require the same standard for relinquishment of these rights).

[4] Father also argues that the trial court failed to adequately provide its reasons for its disposition, and that that failure, *along with* the court's alleged error in denying him the right to self-represent, renders the CHINS adjudications improper. Appellant's Br. at 14. Because we have found no error in the trial court's denial of Likes's motion to withdraw, we need not address Father's argument regarding the court's reasons for its disposition.

decision and reasonable inferences drawn therefrom." *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012).

[20] "Because a CHINS proceeding is a civil action, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). Pursuant to Indiana Code Section 31-34-1-1, a child is a CHINS where sufficient evidence establishes the following elements:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>
>> (A) when the parent, guardian, or custodian is financially able to do so; or
>>
>> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; *and*
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

In sum, the evidence must establish that the "parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283,1287 (Ind. 2014).

[21] "[T]he purpose of a CHINS adjudication is to protect children, not punish parents." *N.E.*, 919 N.E.2d at 106. Our supreme court has cautioned that "[n]ot every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *S.D.*, 2 N.E.3d at 1287. "State intrusion is warranted only when parents lack the ability to provide for their children." *In re N.C.*, 72 N.E.3d 519, 524 (Ind. Ct. App. 2017). "Moreover, when determining whether a child is a CHINS under section 31-34-1-1, and particularly when determining whether the coercive intervention of the court is necessary, the juvenile court 'should consider the family's condition not just when the case was filed, but also when it is heard.'" *Id.* (quoting *S.D.*, 2 N.E.3d 1290).

[22] Father argues that the State failed to establish that the Children needed care, treatment, or rehabilitation that they were not receiving and that were unlikely to be provided or accepted without the court's coercive intervention. He contends that the Children were living with Grandmother, who was providing for all their needs, and that he would have arranged for the Children to live

with Grandmother while he was incarcerated without the State's intervention.[5] Father asserts that the Children could be cared for by Grandmother "based upon the parties' willingness, a change in the custodial order in their paternity cases … by agreement of the parties, a temporary guardianship," or pursuant to Indiana Code Section 31-17-2-25, which applies to emergency placement of a child.[6] Appellant's Br. at 21.

[23] At the time the case was filed and at the factfinding hearing, Father was incarcerated due to his OWI arrest, his second in less than a year, and was unable to care for the Children. By her own admission, Mother is homeless.[7] By Father's own admission, the Children would not be safe with Mother in her current condition. Although Father contends that he would willingly leave the Children in Grandmother's care while he is incarcerated, there is nothing to prevent Mother from removing the Children from Grandmother's care because Grandmother does not have legal custody. The legal actions Father suggests to

---

[5] Father also contends that the dispositional order violated the least restrictive mandate in Indiana Code Section 31-34-19-6 because he and Grandmother willingly agreed to Grandmother's care of the Children during his incarceration, and "the least restrictive alternative is that the [C]hildren would have been placed with [Grandmother] based upon the willingness of all parties, as the family had done in the past." Appellant's Br. at 19. This is just a reframing of his argument that the coercive intervention of the court was unnecessary, and therefore we do not address it independently.

[6] Section 31-17-2-25 permits a person other than a parent to seek a custody determination or a modification of custody when a custodial parent dies or becomes unable to care for the child and to obtain emergency custody pending a final determination.

[7] Father notes that the predispositional report states, "[The children] are placed with grandmother in the same community with mother living in the home." Appellant's Br. at 19 (quoting Appellant's App. Vol. 2 at 42). He contends that the evidence does not support that Mother lived with Grandmother, as Mother testified that she was homeless. Given that both Mother and Father testified that Grandmother was an appropriate caretaker and neither had any objection to the Children being in her care, the error is inconsequential.

grant Grandmother some sort of temporary custody over the Children were not independently pursued by any of the parties. Father suggests that the court, DCS, or the guardian ad litem could have pursued these possibilities, but this merely shows that the State's intervention is necessary.[8]

[24] Furthermore, based upon its initial intake assessment, DCS recommended that the Children each have counseling, and as a result, counseling sessions had been scheduled. Although Father testified that he had taken the Children to counseling on his own in 2020 or 2021, neither Father nor Mother currently has the ability to take the Children to counseling. Father contends that Grandmother would take the Children to counseling, but there is no evidence that Grandmother would arrange for counseling independent of the counseling sessions scheduled through DCS. We conclude that the evidence is sufficient to establish that the coercive intervention of the court is necessary. Accordingly, we affirm.

[25] Affirmed.

Riley, J., and Mathias, J., concur.

---

[8] Father's reliance on *N.C.*, 72 N.E.3d 519, is misplaced. There, the allegations supporting the CHINS petition involved only the mother's neglect. The child was placed with the noncustodial father, and by the time of the factfinding hearing, the father had obtained a custody order and DCS had no concerns about placement with him. On appeal, we concluded that the coercive intervention of the court was unnecessary because the child could not be returned to mother's care without a court order. *Id*. at 525.