## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 09 2019, 8:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jonathan T. Feavel
Feavel & Porter, LLP
Vincennes, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of C.Q. (Minor Child) and

K.Q. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

October 9, 2019

Court of Appeals Case No. 19A-JT-666

Appeal from the Daviess Circuit Court

The Honorable Gregory A. Smith, Judge

Trial Court Cause No. 14C01-1808-JT-250

**Mathias, Judge.**

[1] K.Q. ("Mother") appeals the order of the Daviess Circuit Court terminating her parental rights to her minor child C.Q. ("Daughter"). Mother presents four issues on appeal, which we consolidate and restate as the following three:

I.      Whether the trial court clearly erred in concluding that there was a reasonable probability that the conditions that resulted in Daughter's removal from Mother's care, or the reasons for Daughter's continued placement outside the home of Mother, would not be remedied;

II.     Whether the trial court clearly erred in concluding that termination of the parent-child relationship was in Daughter's best interests; and

III.    Whether the Indiana Department of Child Services ("DCS")'s failure to continue to provide Mother with services violated her statutory and constitutional rights.

[2] We affirm.

## Facts and Procedural History

[3] Mother is the biological mother of Daughter, born in January 2018. In 2010, Mother was admitted to a hospital in Vincennes, Indiana, where she was placed under the care of Dr. Michael Cantwell ("Dr. Cantwell"), the director of the psychiatric inpatient unit. Dr. Cantwell diagnosed Mother with schizophrenia and methamphetamine dependency. Mother's methamphetamine use has caused her schizophrenia to progress more negatively than it otherwise would have. As a result of her mental illness, Mother suffers from auditory hallucinations and often whispers to the voices she hears. She is very guarded

and preoccupied, she delays in answering questions, and sometimes wholly ignores questions.

[4] To treat her illness, Dr. Cantwell prescribed Mother a long-acting anti-psychotic medication, Abilify,[1] which is administered by injection once a month. Mother, who is under the belief that her mental illness is only mild, does not regularly keep her appointments for her injections. In fact, her most recent admission to the hospital resulted from a scheduled injection she missed. Dr. Cantwell described the impact of Mother's mental illness on her ability to function as follows:

> [W]hen it's not controlled properly, either because of not being on the right medicine or having it made worse by drug use, her preoccupation with her internal stimuli I think would significantly distract her attention from the more pressing needs that a child would be—the attention a child would need from the mother. So I think it would significantly impair her ability to focus on things in the real world as opposed to her own internal world.

Tr. p. 14. Dr. Cantwell and his staff have had difficulty maintaining contact with Mother, and at one point her regular commitment was terminated because they could not keep track of her.

[5] In 2014, before the initiation of the instant case involving Daughter, DCS became involved with Mother and her two other children, a nine-year-old and a

---

[1] Abilify is the brand name for the drug Aripiprazole. *See* Medline Plus, U.S. National Library of Medicine. Available at: https://medlineplus.gov/druginfo/meds/a603012.html.

newborn infant. Both children were removed from Mother's care and determined to be children in need of services ("CHINS"). DCS provided services to Mother, but her parental rights to these two children were ultimately terminated. This court affirmed the termination of Mother's parental rights on appeal. *See In re R.Q.*, No. 14A01-1603-JT-524, 2016 WL 6038584 (Ind. Ct. App. Oct. 14, 2016).

[6] While Mother was pregnant with Daughter, her neighbors called the police several times reporting that Mother was screaming. In one instance, the police arrived, and Mother answered the door with a butcher knife in her hand. Despite being visibly pregnant, Mother denied being pregnant. She eventually admitted to being pregnant but told the police that the baby's father was President Donald Trump.

[7] When she was admitted to the hospital to give birth to Daughter, Mother tested positive for methamphetamine and amphetamine. After Daughter was born, Mother experienced auditory hallucinations and stated that she was going to harm herself or her newborn child. She also indicated that she was planning to take the baby and leave the hospital. Due to Mother's behavior, the program director of the hospital's behavioral health unit obtained a court order for Mother's emergency detention. Daughter was removed from Mother's care and placed in foster care.

[8] On January 9, 2018, DCS filed a petition alleging that Daughter was a CHINS. A detention hearing was held that same day, and the trial court found probable

cause that Daughter was a CHINS and ordered that she be removed from Mother's care. Following a hearing on March 23, 2018, the trial court found Daughter to be a CHINS. At the subsequent April 5, 2018, dispositional hearing, the trial court ordered Mother to participate in various services, including: (1) maintaining contact with the family case manager, (2) enrolling in recommended programs, (3) submitting to random drug screens, (4) refraining from the use of illicit substances, (5) finding suitable housing for herself and Daughter, and (6) meeting with medical/psychiatric personnel, as directed by the medical/psychiatric personnel, and taking all prescribed medications as directed. The permanency plan was reunification.

[9] During her supervised visitations with Daughter, Mother did not interact much with the child, often using her phone, staring at the clock, or speaking with someone who was not there. During one visitation, Mother was angry with the auditory hallucination with whom she was talking and began "punching at the air" while holding the child. Tr. p. 126. Most of the time, Mother simply whispered in response to her auditory hallucinations. Mother was rough with Daughter when she changed her diaper, causing the child to cry. She was also careless when handling the infant, failing to prop up her head and not noticing when her head dropped. When speaking with the visitation supervisor regarding feeding the child, Mother stated that the formula needed to be boiling hot to "soothe [Daughter's] tummy." Tr. p. 65.

[10] On March 6, 2018, Mother attended one of Daughter's well-child checkups with her pediatrician and loudly claimed that Daughter was being harmed. This

caused the medical staff to inform Mother that she would have to leave if she did not calm down. Later, in April of that year, one of Mother's scheduled visitations was cut short after Mother threatened to kill the DCS staff. On May 22, 2018, Mother's visitations with Daughter were suspended due to her failure to comply with the dispositional decree.

[11] During this time, Mother did not have stable housing and alternately lived with her boyfriend, another male friend with whom she used drugs, or her alcoholic father. Mother's boyfriend was physically abusive to her. In the spring of 2018, Mother had a black eye when she met with the family case manager and admitted that her boyfriend had hit her. She had another black eye the following January. The case manager offered to provide domestic violence services, which Mother refused. Mother also accused the case manager of living with Mother's boyfriend, which was untrue. Mother's boyfriend also instructed her to not speak with the home-based therapist.

[12] Mother's drug use continued unabated following Daughter's birth and removal from her care. She tested positive for methamphetamine and amphetamine use throughout the CHINS proceedings: of the twenty-seven random drug screens she submitted, Mother tested positive for methamphetamine and amphetamine use on twenty of the screens. During the termination hearings, Mother admitted that she used methamphetamine "recreationally" during the weekends. Tr. p. 159. She was of the opinion, however, that her substance abuse did not affect her ability to parent. She admitted to using methamphetamine the weekend before the termination hearing.

[13]     Mother also continued to show signs of mental illness during the CHINS proceedings. Mother's home-based therapist, Josh Bowers ("Bowers"), who was familiar with Mother from the prior CHINS case involving her two older children, was unable to consistently communicate with Mother. Bowers took Mother to the store to buy supplies for Daughter, but Mother wanted to buy supplies for much older children. Mother also spoke with Bowers about random, off-topic subjects and claimed to be married to President Trump. Mother also threatened to "kick [Bowers's] ass" when he met her outside her boyfriend's residence. Tr. p. 71.

[14]     After a hearing on August 2, 2018, the trial court issued an order on August 6 noting that Mother was not complying with services and continued to test positive for methamphetamine. The trial court also found that Mother had failed to appear for the monthly injection of her medication in March 2018. The court therefore changed the permanency plan from reunification to termination of Mother's parental rights. Also on August 6, the trial court issued an order concluding that, under Indiana Code section 31-34-21-5.6, reasonable efforts to reunify Daughter and Mother were not required because Mother was the subject of a prior termination case involving her two older children and because Mother was not in compliance with the dispositional decree.[2]

---

[2] This statute provides in relevant part:

> (a) Except as provided in subsection (c) [which is inapplicable here], a court may make a finding described in this section at any phase of a child in need of services proceeding.

[15]     On August 24, 2018, DCS filed a petition to terminate Mother's parental rights to Daughter. On December 10, 2018, Mother sent a letter to the trial court claiming that Daughter's foster parents had assumed false identities, had received payments from the government, and had participated in a child pornography ring. Mother's letter also claimed that she had received training from the FBI and that the foster parents were involved in a terrorist attack.

[16]     The court held evidentiary hearings on the termination petition on January 15 and February 8, 2019. At the hearings, Mother falsely testified that Daughter's foster father had a prior conviction for child abuse and that the trial court judge had presided over this matter. The family case manager testified that she had investigated Mother's claims regarding the foster parents and found that they had no basis in reality. Moreover, the trial court judge noted that he had presided over no such criminal proceeding against the foster father. On March

---

(b) Reasonable efforts to reunify a child with the child's parent, guardian, or custodian or preserve a child's family as described in section 5.5 of this chapter are not required if the court finds any of the following:

* * *

(4) The parental rights of a parent with respect to a biological or adoptive sibling of a child who is a child in need of services have been involuntarily terminated by a court under:

(A)  IC 31-35-2 (involuntary termination involving a delinquent child or a child in need of services);

* * *

(C)  any comparable law described in clause (A) or (B) in any other state, territory, or country. . . .

Ind. Code § 31-34-21-5.6.

4, 2019, the trial court issued an order terminating Mother's parental rights to Daughter. Mother now appeals.

## Termination of Parental Rights

[17] The purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for their termination when the parties are unable or unwilling to meet their responsibilities as parents. *Id.* Indeed, parental interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[18] Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove each element by clear and convincing evidence. Ind. Code §
31-37-14-2; *G.Y.*, 904 N.E.2d at 1260. But because Indiana Code section
4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only
one prong of subsection 4(b)(2)(B) has been established by clear and convincing
evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).

Clear and convincing evidence need not establish that the continued custody of
the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cty.
Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005). It is instead
sufficient to show by clear and convincing evidence that the child's emotional
and physical development are put at risk by the parent's custody. *Id*. If the court
finds the allegations in a petition are true, the court shall terminate the parent-
child relationship. Ind. Code § 31-35-2-8(a).

## Standard of Review

We have long had a highly deferential standard of review in cases involving the
termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App.
2011). We neither reweigh the evidence nor assess witness credibility. *Id*. We
consider only the evidence and reasonable inferences favorable to the trial
court's judgment. *Id*. In deference to the trial court's unique position to assess
the evidence, we will set aside a judgment terminating a parent-child
relationship only if it is clearly erroneous. *Id*. Clear error is that which leaves us
with a definite and firm conviction that a mistake has been made. *J.M. v. Marion*

*Cty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

### I. Conditions That Resulted in Daughter's Removal

[22] Mother first claims that the trial court clearly erred by concluding that there was a reasonable probability that the conditions that resulted in Daughter's removal from her care, or the reasons for Daughter's continued placement outside her home, would not be remedied. When deciding whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must determine a parent's fitness to care for the child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156–57 (Ind. Ct. App. 2013), *trans. denied*. The trial court may disregard efforts made only shortly before termination and give more weight to a parent's history of conduct prior to those efforts. *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013).

[23] In the present case, the conditions that resulted in the Daughter's removal from Mother's care and the reasons for her continued placement outside Mother's home were Mother's mental illness and substance abuse. Our courts have long held that a parent's mental illness, by itself, is not sufficient grounds to terminate his or her parental rights. *See In re Tucker*, 578 N.E.2d 774, 780 (Ind. Ct. App. 1991) ("Indiana's termination statute, as interpreted by case law, does not allow termination simply on the basis of mental illness."), *trans. denied*. Here, the trial court did not base its termination decision simply on the fact that

Mother suffers from schizophrenia. Instead, the evidence showed that Mother's mental illness seriously affected her ability to safely parent her child.

[24] To her detriment, Mother frequently missed the scheduled monthly injections of her antipsychotic medication. She displayed signs of suffering from auditory hallucinations during visitations with Daughter; she handled the child roughly and did not actively pay attention to her; she claimed that her infant daughter should be given boiling hot formula; she claimed that Daughter's father was the President of the United States; she accused the case manager of living with her boyfriend; she threatened to kill DCS staff; she threatened to beat up one of her case workers; she accused the foster parents of participating in a child pornography ring; and she accused the trial court judge of presiding over a criminal matter involving the foster father, a claim the trial court judge refuted.

[25] In addition to Mother's mental illness, she continued to use methamphetamine during the CHINS case. She repeatedly tested positive for methamphetamine, and she admitted at the termination that she continued to use methamphetamine on the weekends, although she incredulously claimed that this did not affect her ability to parent. She even admitted to having used methamphetamine shortly before the termination hearing. Mother also failed to maintain safe stable housing. Mother failed to follow through with the services offered to help her in finding housing.

[26] From this evidence, the trial court properly concluded that there was, at the very least, a reasonable probability that the conditions that resulted in

Daughter's removal from Mother's care, or the reasons for Daughter's continued placement outside Mother's home, would not be remedied. *See In re A.J.*, 877 N.E.2d 805, 816 (Ind. Ct. App. 2007) (concluding that trial court did not clearly err in concluding that conditions that led to children's removal from parents would not be remedied where mother suffered from mental health issues that were not likely to be remedied based on mother's prior history and thus there was a risk of future neglect and endangerment of the children), *trans. denied*; *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004) (holding that trial court did not clearly err in concluding that conditions that led to child's removal from the mother's care would not be remedied where there was evidence of the mother's continued drug use and her untreated mental illness), *trans. denied*.[3]

## II. *Best Interests of the Child*

[27]  Mother next argues that the trial court clearly erred by determining that termination of the parent-child relationship was in Daughter's best interests. When determining what is in the best interests of a child, the trial court must go beyond the factors identified by DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. The trial court must subordinate the interests of the parent to those of a child, and the court need not wait until a child is

---

[3] To the extent that Mother argues that the trial court erred in determining that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Daughter's well-being, we need not address such an argument. The trial court was required to find only that one prong of subsection 4(b)(2)(B) had been established. *See In re A.K.*, 924 N.E.2d at 220.

irreversibly harmed before terminating the parent-child relationship. *Id*. Moreover, a recommendation by the case manager or child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id*. at 1158–59.

[28] The evidence presented at the termination hearing clearly established that Mother suffers from a serious mental illness and uses methamphetamine, which exacerbates the symptoms of her mental illness. Mother does not appreciate the seriousness of her mental illness and often misses the scheduled injection of her medication. Her mental illness manifests itself in dangerous and disturbing ways, including threats to harm herself, her child, and others. Mother also continues to abuse methamphetamine. Mother's interactions during visitation showed that she had little bond with the child, and she even threatened DCS staff.

[29] In contrast to Mother's unstable life, the foster parents have been able to provide Daughter with a safe and happy home. The foster parents plan to adopt Daughter, and the family case manager testified that termination of Mother's parental rights and adoption were in Daughter's best interests. The court-appointed special advocate similarly recommended that Daughter be adopted by the foster parents. This testimony, combined with evidence that the conditions that caused the removal of Daughter from Mother's care would not be remedied, was sufficient to show by clear and convincing evidence that

termination of Mother's parental rights was in Daughter's best interests. *See A.D.S.*, 987 N.E.2d at 1158.

### III. Failure to Provide Services

[30]     Mother correctly notes that the termination statute requires that a petition to terminate parental rights must allege, and DCS must prove by clear and convincing evidence,[4] that one of the following is true:

> (i)  The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> (ii)  A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>
> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child[.]

Ind. Code § 31-35-2-4(b)(2)(A). During the CHINS case, the trial court found that reasonable efforts for family preservation or reunification were not required, and DCS stopped providing Mother with services after four months.

---

[4] *See* Ind. Code § 31-37-14-2.

[31] Mother contends that DCS only proved, under subsection 4(b)(2)(A)(ii), that the trial court entered a finding under Indiana Code section 31-34-21-5.6, that reasonable efforts for family preservation or reunification were not required. This, by itself, is without moment, as subsection 4(b)(2)(A) clearly provides that DCS must prove that only one of the conditions listed in that subsection is true.

[32] In addition, Mother's contention is incorrect, as the record shows that Daughter had been removed from Mother for at least six (6) months under a dispositional decree as set forth in subsection 4(b)(2)(A)(i). "This [c]ourt has previously explained that '[f]or purposes of the element of the involuntary termination statute requiring a child to have been "removed from the parent for at least six months under a dispositional decree" before termination may occur, *such a dispositional decree is one that authorizes an out-of-home placement*.'" *In re D.D.*, 962 N.E.2d 70, 75 (Ind. Ct. App. 2011) (citation omitted) (emphasis added) (quoting *A.P. v. Porter Cty. Office of Family & Children*, 734 N.E.2d 1107, 1116 (Ind. Ct. App. 2000), *trans. denied*). Here, the order that authorized Daughter's out-of-home placement was entered on January 9, 2018. Thus, when DCS filed its termination petition on August 24, 2018, Daughter had been removed from Mother for over seven months. Accordingly, the conditions of subsection 4(b)(2)(A)(i) were established.

[33] Mother, proceeding under the mistaken presumption that DCS established only that the trial court had found that reasonable efforts for family preservation or reunification were not required, argues:

> [T]he elements of Indiana Code 31-35-2-4(b)(2) were met only through termination of services to the mother. Given the same, the statute and the due process rights of the mother were violated, and the termination order of the court was erroneous as the mother received services pursuant to the Dispositional Order for less than four (4) months.

Appellant's Br. at 13.

[34] To the extent that Mother argues that she had a statutory right to services, she is incorrect. It is well established that DCS is not required to provide services before commencing termination proceedings. *In re B.H.*, 44 N.E.3d 745, 752 n.3 (Ind. Ct. App. 2015) (citing *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009)), *trans. denied*. And to the extent that Mother claims that she had a due process right to services, we decline to address this argument. First, she did not present such an argument to the trial court. An appellant may not present an argument, even one of constitutional dimension, for the first time on appeal. *Hite v. Vanderburgh Cty. Office of Family & Children*, 845 N.E.2d 175, 180 (Ind. Ct. App. 2006) (citing *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003)). Moreover, Mother fails to develop her one-sentence argument any further, and she cites no authority to support her position. Her argument is therefore also waived for failure to make a cogent argument. *See* Ind. Appellate Rule 46(A)(8)(a) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on[.]"); *N.C.*

*v. Ind. Dep't of Child Servs.*, 56 N.E.3d 65, 69 (Ind. Ct. App. 2016) ("A party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record."), *trans. denied*.

## Conclusion

The trial court did not clearly err in concluding that the conditions that resulted in Daughter's removal from Mother's care, or the reasons for Daughter's continued placement outside Mother's home, would not be remedied. Nor did the trial court clearly err in determining that termination of Mother's parental rights was in Daughter's best interest. Lastly, Mother's arguments regarding DCS's failure to continue to provide services to her are without merit. Accordingly, we affirm the judgment of the trial court.

Affirmed.

Robb, J., and Pyle, J., concur.